USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 2 3 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X

LISANDRO RODRIGUEZ,

                Plaintiff,

  -v-

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

------------------------------------------------------------- X

11 Civ. 7354 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

    Lisandro Rodriguez ("Plaintiff") seeks review of the decision by defendant Commissioner of Social Security (the "Commissioner") to deny him Child Disability Benefits ("CDB") and Supplemental Security Income ("SSI") based on the finding that Plaintiff was not and is not disabled for purposes of the Social Security Act. After a hearing on March 16, 2010, Administrative Law Judge Mark Solomon (the "ALJ") affirmed the Commissioner's denial of benefits to Plaintiff on April 26, 2010. Thereafter, on October 18, 2011, Plaintiff filed this action pursuant to 42 U.S.C. § 405(g). (ECF No. 1.)

    The parties have cross-moved for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF Nos. 8, 15.) This case was transferred to the undersigned on June 6, 2013. (ECF No. 19.) For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is DENIED, and Defendant's cross-motion for judgment on the pleadings is GRANTED.

I.   BACKGROUND

A. Medical Background

This is a case where Plaintiff seeks benefits under the Social Security Act on the grounds that he suffers from "undifferentiated schizophrenia, an adjustment disorder, attention deficit hyperactive disorder, and major depressive disorder." (Compl. ¶ 4, ECF No. 1.) Plaintiff alleges that he became disabled and unable to work on or about January 1, 1987 (id.); because Plaintiff was born on May 11, 1968 (Admin. R. ("R." or "Record") at 41, ECF No. 6[1]), Plaintiff would have been 18 at that time. According to the record, however, Plaintiff began receiving treatment for schizophrenia as an out-patient at the New York-Presbyterian Adult Psychiatric Clinic on May 13, 1992, at which time he would have just turned 24. (R. at 215.)

As of August 8, 2005, Plaintiff's condition was being treated with Zyprexa. (R. at 214.) On October 27, 2006, Plaintiff filled out new patient paperwork at Inwood Community Services, and on January 29, 2007, he was evaluated at Inwood by psychiatrist Dr. Mercedes Brito.[2] (R. at 239-240). Dr. Brito diagnosed Plaintiff with schizophrenia, noting a friendly manner, normal posture, and a calm mood, but poor eye contact, flat affect, minimal speech, and below-average cognitive function. (R. at 239.)[3] In a review on Feburary 26, 2007, Dr. Brito notes Plaintiff

---

[1] The Court notes that the administrative record in this matter was filed by the Commissioner with his answer (see Answer ¶ 6, ECF No. 5) but does not appear as a separate entry on the docket.
[2] The ALJ mistakenly refers to Dr. Brito as a male in his opinion. (R. at 30.)
[3] A Global Assessment Functioning ("GAF") score represents "the clinician's judgment of the individual's overall level of functioning." Diagnostic and Statistical Manual of Mental Disorders 30 (4th ed. 1994). The parties dispute whether Dr. Brito gave plaintiff a GAF score of 30 or 50 on January 29, 2007. A GAF score of 41 to 50 represents serious symptoms that present serious difficulty in social, occupational, or school functioning. Id. at 34. A GAF score of 21 to 30 represents behavior that is considerably influenced by delusions or hallucinations, a serious impairment in

2

was taking Zyprexa and Abilify for his condition, and determined that his treatment regimen did not need to be modified. (R. at 285.)

In March and April of 2007, Plaintiff met with a social worker at Inwood and "expressed discomfort" because he was not working and had to borrow money from his mother and sister. (R. at 281.) He discussed "possible avenue[s] to explore for employment" with the social worker. (R. at 280.) In September 2007, he told Dr. Brito he felt "balanced" and was doing "well." (R. at 259). In October 2007, Plaintiff met with another social worker, who noted that Plaintiff's "interpersonal social skills are more enhanced." (R. at 264.) In January 2008, Plaintiff spoke to a social worker and stated that he planned to seek job placement through the Career Services Department at his college. (R. at 262.) During the same month, Plaintiff met with Dr. Brito again, who wrote in her notes that Plaintiff was "doing well" and had "no insomnia." (R. at 257.) In February 2008, Plaintiff missed at least two sessions with a social worker due to school work and exams. (R. at 260.) He reported continuing to look for work and that he had applied for a position as a library assistant. (R. at 260.) In September 2008, Dr. Brito noted that Plaintiff had moved to Pennsylvania, where he was painting, "doing well," and looking for a job. (R. at 249.) In October 2008, Plaintiff stated to Dr. Brito that he was uncomfortable being around people. (R. at 246.) In January 2009, Plaintiff expressed interest to a

---

communication or judgment, or an inability to function in almost all areas. Id. The parties dispute whether Dr. Brito's handwritten notes for this evaluation list a GAF score of 50 or 30. (See Pl.'s Mem. at 2, ECF No. 9; Def.'s Mem. at 5-6, ECF No. 16.) The Court notes that Dr. Brito's handwritten notes appear to state a GAF score of 50, and that a score of 50 would also be more in line with Dr. Brito's other findings on January 29, 2007, but it finds this dispute to be immaterial in light of the fact that the ALJ did not explicitly rely on this GAF score in his opinion.

3

social worker in using Vocational Educational Services for Individuals with Disabilities to help him find a job. (R. at 400.)

On February 19, 2009, roughly three weeks after filings his applications for CDB and SSI benefits, Plaintiff was evaluated by consulting psychologist Dr. Rochelle Sherman. (R. at 333.) Dr. Sherman noted that Plaintiff helped his mother do the cooking, cleaning, and shopping, and Plaintiff reported having an adequate network of friends and social contacts. (R. at 333.) Dr. Sherman found that Plaintiff maintained eye contact, did not display any unusual mannerisms, and was oriented as to time, place, and person. (R. at 333.) Dr. Sherman further noted that Plaintiff denied having paranoid or suicidal ideations, but did report having problems with sustained eye contact, anxiousness, and nervousness. (R. at 333.) Dr. Sherman concluded that Plaintiff appeared capable of adequate interactions with supervisors and coworkers in a standard work setting, and appeared capable of performing work activities in a low-stress setting. (R. at 334.) Dr. Sherman diagnosed Plaintiff with an anxiety disorder and ruled out a schizoaffective disorder. (R. at 334.)

On April 14, 2009, Dr. Hector Goa evaluated Plaintiff.[4] (R. at 370.) According to Dr. Goa's notes, Plaintiff was referred by his therapist for a Comprehensive Psychiatric Evaluation with special emphasis on his capacity to work. (R. at 370.) Dr. Goa found that Plaintiff was friendly and cooperative, with clinically normal intellectual function. (R. at 371, 374.) Dr. Goa also found that Plaintiff was depressed and anxious, with a flat affect and poor concentration,

---

[4] The ALJ refers to Dr. Goa as "Dr. Gao" in his opinion. (R. at 30.)

4

experienced auditory hallucinations at night, and had extreme psychosocial stress that made him potentially dangerous to others. (R. at 372-375.) Dr. Goa diagnosed Plaintiff with paranoid schizophrenia, major depressive disorder, and attention deficit hyperactivity disorder, with a GAF score of 30. (R. at 370-376.) Dr. Goa opined that Plaintiff was "definitely unable to work" and that his condition "runs a deteriorating course over time." (R. at 376.)

At the request of Plaintiff's counsel in this action (see R. at 497), on June 29, 2009, Dr. Brito completed a Psychiatric/Psychological Impairment Questionnaire for Plaintiff. (R. at 531.) Dr. Brito indicated on the Questionnaire that Plaintiff had a GAF score of 50. (R. at 531.) Dr. Brito also made findings that Plaintiff suffered from, among other issues, "illogical thinking or loosening of associations," "psychomotor agitation or retardation," and "difficulty thinking or concentrating." (R. at 532.) Dr. Brito noted on the Questionnaire that Plaintiff required emergency room treatment on two occasions for his symptoms (R. at 533),[5] and indicated that Plaintiff's mental activity was "markedly limited" in every subcategory of "Understanding and Memory," "Sustained Concentration and Persistence," and "Social Interactions." (R. at 533-535.) According to the Questionnaire, "markedly limited" meant that the symptoms "effectively preclude[d] the individual from performing the activity in a meaningful manner." (R. at 533.) Finally, Dr. Brito also indicated on the Questionnaire that Plaintiff's "impairments [are] likely to produce 'good days' and 'bad days'" and estimated that, should Plaintiff find

---

[5] As noted by the ALJ (see R. at 30), no evidence of emergency room treatment is found in the record.

5

employment, Plaintiff was likely to be absent from work more than three times per month as a result. (R. at 537-538.)

In an August 4, 2009 psychiatric review, Dr. Brito noted that Plaintiff had sold two of his paintings and was keeping himself busy by painting. (R. at 495.) On August 25, 2009, Dr. Brito reaffirmed her diagnosis of undifferentiated schizophrenia, and determined Plaintiff to have a GAF of 65. (R. at 521-523.) On September 1, 2009, Plaintiff visited a social worker, who noted that Plaintiff's sleeping pattern was normal. (R. at 492.)

On February 25, 2010, Dr. Brito again stated in a letter that Plaintiff's condition was undifferentiated schizophrenia. (R. at 542-43.) Dr. Brito also stated that her clinical findings included poor memory, sleep disturbance, and emotional lability, and she reaffirmed the validity of her findings on the June 29, 2009 Questionnaire. (R. at 542-43.)

### B. Personal Background and Testimony

Plaintiff began undergraduate studies in 1986 or 1987, but did not receive his Bachelor's degree (in Fine Arts) until 2008. (R. at 41-42, 333.) He was last employed in 2005, doing paid work-study at a college he attended. (R. at 42, 61.) Previously, Plaintiff had been employed as a security guard from 2000 to 2001, but was laid off because he had trouble staying awake during his shift. (R. at 43.)

Plaintiff testified schizophrenia and paranoia as the biggest barriers to his being able to work. (R. at 47.) He stated that he has been seeing a therapist every two weeks, and has been able to travel to and from those visits without assistance

by taking public transportation. (R. at 46-47.) However, he also reports auditory hallucinations that last a "few seconds" and the need to take naps during the day when he does not feel well. (R. at 50.) On bad days, Plaintiff states that he is not able to travel alone and feels anxious leaving his home. (R. at 51-52.) In response to a question from the ALJ at the hearing about the side effects of his medications, Plaintiff reported that they "give [him] sometimes palpitations [sic] and they make [him] a little bit anxious." (R. at 47.)

Plaintiff testified that he was able to obtain a driver's license (R. at 48), that one of his hobbies is reading, and that he can read for one to two hours at a time. (R. at 50.) He also draws paintings and reported that he sold his paintings "once in a while." (R. at 43-44.)

Plaintiff's sister, Vicki Rodriguez, testified at the hearing that she has lived in Pennsylvania for the past five years, and that Plaintiff visits her two to three times a month. (R. at 56.) Rodriguez testified that, during those visits, Plaintiff spends most of his time in the house, painting, and does not like to be around people. (R. at 57.) She also testified that Plaintiff has at least one close friend in Pennsylvania, Rodriguez's neighbor Joseph Johnson. (R. at 58-59.) Plaintiff testified that he visited Johnson in Pennsylvania "once or twice," but was not able to provide clear answers to the ALJ in response to questions about whether Plaintiff visited Pennsylvania more frequently. (R. at 44.) Plaintiff stated that he was unsure of his sister's address, and appears to confirm, in a response a question from the ALJ, that his sister lived in New York City. (R. at 44-45.)

### C. Procedural History

On January 29, 2009, Plaintiff applied for CDB and SSI benefits for an alleged disability beginning on January 1, 1987. (Compl. at ¶ 6.) His applications were rejected by the Commissioner on March 31, 2009. (R. at 71-74.) Plaintiff subsequently requested an administrative hearing. (Compl. at ¶ 7.) On March 16, 2010, the ALJ conducted a hearing at which Plaintiff appeared (with a non-attorney representative) and testified, along with a Vocational Expert ("VE"). (R. at 24, 37.) In an April 26, 2010 decision, the ALJ found that Plaintiff was not disabled and affirmed the denial of CDB and SSI benefits by the Commissioner. (R. at 31.)

## II.   DISCUSSION

### A. Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A determination of the ALJ may be set aside only if it is based upon legal error or is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); see also Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999). "Substantial evidence, however, is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Rosa, 168 F.3d at 77 (quoting Pratts v. Chater, 94 F.3d 34, 37 (2d. Cir. 1996)).

If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. 42 U.S.C. § 405(g); Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). The Court's role is not to make a de novo determination of disability. See Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002) ("[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner"). The Court should uphold the Commissioner's decision upon a finding of substantial evidence, even when contrary evidence exists. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder"); see also DeChirico v. Callahan, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming ALJ decision where substantial evidence supported both sides).

B. Analysis

Plaintiff's SSI claim requires a showing that he is disabled within the meaning of the Social Security Act, which means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Plaintiff's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). Additionally, for his CDB claim,

Plaintiff must show that he was under a disability before he attained 22 years of age.[6] Id. § 402(d)(1)(B)(ii).

The Commissioner undertakes a five-step process in making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920; DeChirico, 134 F.3d at 1179-80. The Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Tejada, 167 F.3d at 774. A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden in the final step. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).

Plaintiff challenges the ALJ's finding that Plaintiff was and is not disabled on four grounds: (1) that the ALJ's finding that Plaintiff had no listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03 was unsupported by

---

[6] As noted in Part I.A, supra, Plaintiff was first treated for schizophrenia when he was approximately 24 years old. Though Plaintiff argues that he was 18 years old at the onset of his impairment (Pl.'s Mem. at 1), there is no evidence in the record to substantiate a diagnosis of schizophrenia prior to age 24.

10

substantial evidence; (2) that the ALJ failed to follow the "treating physician rule"; (3) that the ALJ failed to properly evaluate Plaintiff's credibility; and (4) that the ALJ relied on "flawed" VE testimony. (Pl.'s Mem. at i, ECF No. 9.) For the reasons set forth below, Plaintiff fails on each of these grounds—the ALJ's findings and conclusions were supported by substantial evidence.

### 1. Listed Impairment

A disability due to schizophrenia, paranoia, or other psychotic disorder is governed by 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.03, which contains three sub-paragraphs—Paragraphs A, B, and C. 20 C.F.R. Part 404, Subpart P, App. 1, § 12.03. In order to qualify as disabled under § 12.03, a claimant must fulfill the conditions set forth in either Paragraphs A and B, or Paragraph C alone. Id. The ALJ made no findings with respect to Paragraph A, but determined that Plaintiff did not satisfy the requirements of either Paragraph B or C. (R. at 28.) Plaintiff challenges the ALJ's determination regarding Paragraph B, but does not challenge his determination regarding Paragraph C. (Pl.'s Mem. at 9-10.)

Paragraph B requires that Plaintiff's condition result in at least two of the following: (1) "marked[7] restriction of activities of daily living"; (2) "marked difficulties in maintaining social functioning"; (3) "marked difficulties in maintaining concentration, persistence, or pace"; and (4) "repeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, App. 1

---

[7] A marked restriction must be "more than moderate, but less than extreme." 20 C.F.R. Part 404, Subpart P, App. 1 § 12.00(C).

11

§ 12.03(B). Plaintiff bears the burden of proving that he has a listed impairment under, inter alia, Paragraph B. See Schaal, 134 F.3d at 501.

The ALJ's finding that Plaintiff did not meet his burden of showing that his impairment satisfies Paragraph B was supported by substantial evidence. The ALJ determined that Plaintiff has mild restrictions in activities of daily living, moderate restrictions in social functioning, moderate difficulties in concentration, persistence, or pace, and no extended episodes of decompensation. (R. at 28.) The ALJ cites extensively to the record in support of these findings. (R. at 28.) In addition, the ALJ noted that Plaintiff could travel by himself by train to visit his sister, was alert and oriented as to time, place, and person, and his speech was coherent and goal-oriented. (R. at 27.) He further noted that Plaintiff had been actively seeking employment, which "belies his assertion of inability to function in the workplace." (R. at 27.) While the ALJ acknowledges that Plaintiff mentioned being uncomfortable around people to his doctors, the record includes notes from Plaintiff's therapy sessions which indicated that his social skills were improving. (R at 27.) The ALJ also cited to Plaintiff's testimony in which he stated that he was able to read for stretches of one to two hours at a time without losing concentration. (R. at 27.) In sum, the Court finds that the ALJ's determination that Plaintiff did not meet the criteria set forth in Paragraph B, and thus is not disabled under § 12.03, is supported by substantial evidence.

### 2. The "Treating Physician Rule"

Plaintiff next argues that the ALJ failed to give proper weight to the opinions of Dr. Brito and Dr. Goa as required by the "treating physician rule." (Pl.'s Mem. at 10-14.) Under this rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations and quotations omitted); see also 20 C.F.R. § 404.1527(d)(2).

If an ALJ determines that a treating physician's opinion is not to be given controlling weight, he must consider several factors in determining how much weight to give the opinion, including: the "length of the treatment relationship and the frequency of examination," the "nature and extent of the treatment relationship," the "relevant evidence . . . , particularly medical signs and laboratory findings supporting the opinion," "the consistency of the opinion with the record as a whole," "whether the physician is a specialist in the area covering the particular medical issues," and other factors "which tend to support or contradict the opinion." Burgess, 537 F.3d at 129 (internal quotations omitted); § 404.1527(d)(2)(i)-(ii), (3)-(6). After considering these factors, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." Burgess, 537 F.3d at 129; 20 C.F.R. § 404.1527(d)(2).

In this case, the ALJ acknowledged that Dr. Brito was Plaintiff's treating physician, but determined that her opinion should be given "some weight" rather than controlling weight because her "assessment was overly restrictive in light of the evidence in the record." (R. at 30.) The Court finds that the ALJ's determination as to Dr. Brito was supported by substantial evidence. In support of this finding, the ALJ noted inconsistencies between Dr. Brito's notes (which indicated that Plaintiff had been hospitalized twice for his condition and had a loosening of associations) and the rest of the record. (R. at 30.) The ALJ noted that there were no hospital records reflecting that Plaintiff had ever been hospitalized for his condition and no evidence to support the conclusion that Plaintiff had a loosening of associations. (R. at 30.) To the contrary, the ALJ notes that, according to Dr. Sherman, Plaintiff "was oriented to time, place, and person. He was able to identify many prominent political figures and was able to repeat an adequate number of digits in precise forward and backward order." (R. at 27.) Further, in response to Dr. Brito's conclusion that Plaintiff would be absent from work at least three days per month because of his impairment, the ALJ noted that the record shows that Plaintiff "functions well"—Plaintiff's speech was coherent, he was able to read for one to two hours at a time, he was actively looking for employment, and he was able to travel by himself to Pennsylvania. (R. 27, 30, 56.)

The ALJ determined that Dr. Goa's opinions would receive "little weight" because they were "overly extreme" in light of the other evidence in the record. (R. at 30.) The Court finds that the ALJ's determination as to Dr. Goa was also

14

supported by substantial evidence. As the ALJ noted, Dr. Goa concluded that Plaintiff was potentially a danger to others and had the "most severe psychiatric condition." (R. at 30). To the contrary, the ALJ cited record evidence concerning Plaintiff's ability to go to school (and graduate), to perform household chores, and to paint on a regular basis. (R. at 30.) The record also demonstrates that Plaintiff visited his sister on several occasions and interacted with a friend while he was there. (R. at 44-45, 56-59.)

Plaintiff relies on Bauer v. Astrue, 532 F.3d 606 (7th Cir. 2008), to support his argument that his ability to function in daily living activities is insufficient to overcome the treating physician rule. (Pl.'s Reply at 1-2.) In Bauer, the Seventh Circuit found that evidence that an applicant could perform chores, take care of her personal hygiene, prepare meals, shop for food, and care for a 13-year-old child did not overcome the opinions of her treating mental health professionals regarding disability. Bauer, 532 F.3d at 608-09. Bauer is inapposite, however, because of the internal inconsistencies in Dr. Brito's own findings and the inconsistencies with her findings, Plaintiff's testimony, and the rest of the record. Additionally, Dr. Goa is not a "treating physician" at all—he evaluated Plaintiff on one occasion. The Court finds that the ALJ followed the factors set forth in 20 C.F.R. § 404.1527(c)(2) and in cases like Burgess, and sufficiently explained the appropriate weight to be given to the various medical opinions in the record.

In so finding, the Court is not suggesting that Plaintiff does not suffer from some impairment for which he has received treatment over the years, particularly

15

from Dr. Brito. The standard for disability set forth in 42 U.S.C. § 423(d)(1)(A), however, is quite clear—it requires proof of an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last <u>for a continuous period of not less than 12 months</u>." 42 U.S.C. § 423(d)(1)(A) (emphasis added). Particularly in light of this standard, the ALJ's determination as to the appropriate weight to give the conclusions of Dr. Brito and Dr. Goa was supported by substantial evidence.

### 3. <u>Plaintiff's Credibility</u>

Plaintiff next argues that the ALJ failed to apply the proper legal standard in determining Plaintiff's credibility, to properly support his credibility determination, and to give sufficient weight to Plaintiff's statements regarding his subjective level of impairment. (Pl.'s Mem. at 16-17.)

With respect to the legal standard, Plaintiff argues that the ALJ erred by evaluating the consistency of Plaintiff's statements against the ALJ's own assessment of Plaintiff's functionality, rather than against the evidence in the record. (<u>Id.</u> at 16.) To the contrary, the ALJ applied the relevant criteria and cites several sources of evidence, including medical notes and testimony given by Plaintiff and Plaintiff's sister (which were inconsistent). (R. at 29.) An ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." <u>Tejada</u>, 167 F.3d at 776 (citation omitted). If the ALJ finds

that a claimant is not credible, he must present "specific reasons for the finding on credibility, supported by the evidence in the case record" which are "sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling 96-7p, 61 Fed. Reg. 34,484, 1996 WL 374186. The ALJ's determination is entitled to deference unless it is not set forth "with sufficient specificity" to enable the Court to decide whether it is supported by substantial evidence. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).

Here, the ALJ's determination as to Plaintiff's credibility was set forth with sufficient specificity and is supported by substantial evidence. In his written opinion, the ALJ carefully explains his concerns with the credibility of several aspects of Plaintiff's testimony. (R. at 27, 29.) The ALJ clearly reviewed the medical evidence in the record and noted that the mental health professionals who treated Plaintiff did not document such extensive memory lapses as would explain Plaintiff's inability to recall the many visits to Pennsylvania reported by the mental health professionals and Plaintiff's sister. (R. at 29.) The ALJ goes on to cite evidence in the record which shows that Plaintiff functions in a way that is inconsistent with extensive memory loss, including maintaining concentration while reading, using public transportation independently, and dependably performing household chores. (R. at 29.) Contrary to Plaintiff's allegations (Pl.'s Mem. at 19), the ALJ both considered and addressed the testimony of Plaintiff's sister in connection with both Plaintiff's level of functioning (reflected by his trips to visit his

17

sister) and Plaintiff's own credibility. (R. at 29.) As the ALJ's findings as to Plaintiff's testimony were supported by substantial evidence, this Court defers to the credibility determinations he made while presiding over the hearing.

### 4. VE Testimony

Finally, Plaintiff argues that the VE's testimony concerning the kinds of work Plaintiff would be able to perform constituted an impermissible lay assessment that should not have been considered by the ALJ. (Pl.'s Mem. at 19-20.) For VE testimony to be "useful" to an ALJ, it must address "whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job." Aubeuf v. Schweiker, 649 F.2d 107, 114 (2d. Cir. 1981).

Because the Court has previously found that the ALJ's other determinations are supported by substantial evidence, the Court finds that the hypothetical put to the VE at the hearing concerning Plaintiff was appropriate. During the hearing, the ALJ stated that the hypothetical claimant had "no exertional limitations other than he has to avoid exposure to concentrated respiratory irritants," is able to "perform simple low stress work limited to occasional interpersonal contact with co-workers and the general public," and "can maintain attention and concentration for extended two hour segments." (R. at 64-65.) The VE then testified, after having reviewed Plaintiff's work history, that while Plaintiff could no longer perform the "past relevant work" which he had previously performed, a hypothetical person of Plaintiff's age and with his education, work experience, and limitations could perform the jobs of a kitchen helper, photocopying machine operator, or cafeteria

attendant. (R. at 64-65.) The ALJ's characterization of the record was consistent with the findings the Court has previous reviewed and found to be supported by substantial evidence. The ALJ's consideration of the VE testimony is thus also not a basis for declining to defer to the ALJ's findings and conclusions.

III.  CONCLUSION

For the reasons set forth above, Plaintiff's motion for judgment on the pleadings is DENIED and the Commissioner's cross-motion for judgment on the pleadings is GRANTED.

The Clerk of Court is directed to close the motions at ECF Nos. 8 and 15, and to terminate this action.

SO ORDERED.

Dated:    New York, New York
          October **23**, 2013

                                            KATHERINE B. FORREST
                                            United States District Judge